IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| MELINDA K. MAYNARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07-3369-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

### ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits. The Commissioner's decision is affirmed.

### I. BACKGROUND

Plaintiff was born in September 1963, has a seventh grade education, and has prior work experience as a waitress, poultry processor, housekeeper, and fast food worker. She filed her application for benefits on August 8, 2003, alleging she became disabled on January 28, 2003, due to a combination of degenerative disc disease, chronic obstructive pulmonary disease ("COPD"), and hepatitis C.[1] Evidence about Plaintiff's mental abilities was also developed during the administrative process and

---

[1] Several medical records reflect Plaintiff may also have hepatitis B. All such records reflect Plaintiff's statements: all medical testing confirms she has hepatitis C, but the Court has not found a report of any test confirming she has hepatitis B.

considered by the ALJ.[2]  Plaintiff's history is quite voluminous, and what follows is an excerpted summary of the important aspects of the information available.

Plaintiff was treated by Esther Wadley, D.O., from October 2002 through July 2003.  At her initial appointment, Plaintiff complained primarily about back pain; Dr. Wadley noted Plaintiff's report that she suffered from hepatitis and also diagnosed Plaintiff as suffering from COPD.  R. at 676.  Commencing with that initial visit (or shortly thereafter), Dr. Wadley began prescribing hydromorphine for Plaintiff's degenerative disc disease, hydrocodone for COPD, and Wellbutrin for depression.  Dr. Wadley's notes are not illuminating: they do not indicate whether Plaintiff's condition was improving or deteriorating, and practically all they reflect is that Plaintiff came in and received refills on her medication.  R. at 628-70.

During much of this time, Plaintiff was also seeing Dr. Donald Mangum at St. John's Regional Health Center.  Dr. Mangum primarily treated Plaintiff's hepatitis, but he also encouraged Plaintiff to stop smoking to improve her breathing and overall health.  At her last appointment in March 2003, Dr. Mangum described Plaintiff as a "[c]hronically ill appearing woman in no acute distress. . . . The patient does have history of signficant fibrosis via liver biopsy but proved intolerant to the side effects of pegylated Interferon.  Currently, liver disease is compensated."  R. at 599.  Plaintiff's condition was largely unchanged in October 2003.  R. at 702-07.

Meanwhile, Plaintiff was seeking additional pain medication from other sources.  This fact began to come to light in July 19, 2003, when Plaintiff went to the emergency room at Doctors Hospital of Springfield and reported she was out of pain medication and her doctor's office was closed.  She was given Dilaudid (a form of hydromorphone) but a note was made for her to follow up with "Dr. McKay or Baker."  R. at 677-80.  On July 25, Plaintiff returned complaining of chronic pain and fibromyalgia, and again reported that her doctor's office was closed.  More Dilaudid was prescribed, and Plaintiff

---

[2]Plaintiff applied for benefits on two prior occasions and was denied both times.  The last denial was effective on February 20, 2002.  The alleged onset date in this case is after that date, so there is no issue about reopening the prior applications.

was to follow up with "Angie Powers." R. at 681-83.[3] Ms. Powers was a nurse, and she referred Plaintiff to the pain clinic; however, Dr. Baker referred Plaintiff to a psychologist to assess her "psychological functioning and coping mechanisms in order to make recommendations should she become a candidate for long-term narcotic treatment." Plaintiff failed to appear for her first appointment, but eventually saw the psychologist – Dr. Mark Glover – on October 23, 2003. Dr. Glover noted difficulty during the examination because Plaintiff's supposed "husband" insisted on being present and providing answers to questions on her behalf. Collectively, they reported Plaintiff suffers from hepatitis B and C, emphysema, COPD, brain lesions, depression and "final stage liver disease." Plaintiff had not seen a psychiatrist as recommended, and was taking Wellbutrin for depression and Xanex for anxiety. R. at 699.

Dr. Glover found it unnecessary to administer the traditional tests to determine Plaintiff's potential to abuse prescription pain medication because her medical records revealed that she was already doing so. "[S]he has been seeking pain medications and frequently runs out of her medications early. She evidently told Angie's office that she had not been to the ER between visits, when in fact it was documented that she had been seen twice at the Doctors Hospital ER seeking pain medications. She appears to have been 'fired' by several providers who became uneasy with her medication cravings." R. at 700.

Plaintiff returned to Dr. Baker on December 2, 2003, complaining of pain that had lasted for the last fifteen years that was presently a '9' on a scale of one to ten. Dr. Baker's testing revealed "[s]ome tenderness on palpation in the lumbar spine" but nothing else remarkable. He scheduled an MRI and, after acknowledging Dr. Glover's concerns, prescribed Kadian and Gabitril with certain instructions, including an instruction that she not take any other medication. R. at 986-87. Plaintiff quickly

---

[3]At some point, Plaintiff went to White Oak Medical, Inc., and from there was referred to Branson Neurology & Pain Center. Dr. Kenneth Sharlin examined Plaintiff on September 3, 2003, and provided another prescription for Dilaudid. R. at 695-96. An MRI was performed on September 10 – after Dr. Sharlin's physical exam. There was mild loss of disc signal, a mild disc protrusion, and mild degenerative disease at L3-L4 and L4-L5, but nothing else of note. R. at 697-98.

3

disobeyed this directive, and Dr. Baker declined to treat her further. R. at 985. Before that could happen, an MRI was performed disclosing mild degenerative disc disease and moderate facet joint arthrosis. R. at 988.[4]

On April 12, 2004, Plaintiff went to the Branson West Physicians Group to request refills of her pain medication. R. at 950. She returned on April 16 with a similar request. R. at 946. On April 22, and weekly for the next three weeks, Plaintiff again sought refills of Xanax and Percocet. R. at 930, 932, 934, 940-41.

On April 27, 2004, the status of Plaintiff's liver was discussed; she was told that her fatigue was "most likely related to progression of liver disease" and in light of her depression another trial of interferon was not suggested. Plaintiff was directed to return in one month for re-evaluation, but she did not return until October 4, 2005. R. at 903-04; 936-37. Interferon was ruled out at the October 2005 appointment because of Plaintiff's "depression and continued intermittent alcohol use" and additional tests were ordered. Dr. Magnum's office saw Plaintiff periodically, with the last recorded visit occurring on April 4, 2006. At that time, Plaintiff indicated she was constantly fatigued, but attributed this to her breathing problems. Plaintiff's liver disease was in check, and she was encouraged (as she had on many other occasions) to stop smoking. R. at 992-93.

On July 27, 2005, Plaintiff saw Dr. Kennith Miller for the first time. The intake information reflects Plaintiff "needs meds refilled and requests new doctor." She had been seen at a different clinic the previous day "and got refills for everything but the narcotics." She continued to see Dr. Miller on a monthly basis until March 24, 2006. The records from these visits are devoid of any test results, yet Dr. Miller consistently prescribed Percocet for pain, Xanax for anxiety, medication for asthma, and Prozac for depression. He also advised her to stop smoking. R. at 1005-45. At the last appointment, Dr. Miller also completed a Medical Source Statement - Physical ("MSS-P"). The MSS-P indicates Plaintiff can lift ten pounds, stand or walk eight minutes at a

---

[4]The ALJ discussed additional instances in which it appeared Plaintiff was addicted to painkillers (as opposed to needing them for valid treatment). R. at 23.

4

time for a total of no more than two hours per day, sit for fifteen minutes at a time for no more than two hours per day, and requires fifteen minutes of rest every fifteen minutes of the day. R. at 957-59. Dr. Miller's notes from that day mentioned receipt of the form and observed "[a]ll of the questions on her sheet of paper are subjective," R. at 1007, and Plaintiff testified that she provided much of the information about her limitations and Dr. Miller recorded her answers on the form. R. at 1242.

Dr. Aaron Lewis performed a consultative examination on November 12, 2005. His report chronicles Plaintiff's complaints and treatments. Plaintiff reported she could walk half a block before shortness of breath would require her to stop. Dr. Lewis' examination of Plaintiff's spine revealed she "had normal gait and station. Patient ambulated from the waiting room to exam room (approximately 10 feet) without difficulty. Patient was able to walk without an assistive device. Patient was able to heal-to-toe walk as well as heel and toe walk. Patient was able to squat without difficulty." He opined that Plaintiff did not "have any limitation on her ability to sit or stand and her walking would likely be limited to a quarter mile at a time at a moderate pace, the limiting factor being her shortness of breath due to her lung disease." R. at 735-39

On November 15, 2005, Plaintiff underwent a consultative psychological exam performed by Dr. David Lutz. He noted Plaintiff "seemed to show adequate effort and persistence. However, I still have concerns about the reliability and validity of this testing . . . ." Tests designed to ascertain the validity of the results of other tests indicated "an inconsistent, invalid profile. Such a validity profile indicates considerable overstatement of pathology, suggesting that the person greatly overstated symptoms." Dr. Lutz determined Plaintiff suffered from depressive disorder, personality disorder, and borderline intellectual functioning, with possible major depression or dysthymic disorder. He reported her IQ score as 61 but had "little faith in the accuracy of this score" and "suggest[ed] her true score is more likely in the 70s." He assessed Plaintiff's GAF score as 55. R. at 745-52.

Another psychological examination was performed on February 13, 2006, this time by Dr. Eva Wilson. R. at 953-55. Dr. Wilson prepared Medical Source Statement -

5

Mental ("MSS-M") six weeks later. The MSS-M indicates Plaintiff is markedly limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time, and in setting realistic goals or making plans. It also indicates Plaintiff is moderately limited in her abilities to remember locations, procedures, maintain a schedule, sustain a routine without supervision, accept instructions and criticism, and work with others without being distracted. Plaintiff's ability to understand, remember, and carry out simple instructions, make simple work-related decisions, interact with the public, and to request assistance were mildly limited. R. at 961-64.

During the hearing (held on April 3, 2006), Plaintiff testified she had been seeing Dr. Wilson weekly for the last three weeks and Dr. Miller monthly for approximately one year to get prescriptions refilled. R. at 1219-20. She testified she uses four different inhalers as well as a breathing machine, which she is required to use four times a day. These treatments are helpful on some, but not all, occasions, and she has difficulty breathing at all times (even when she is sitting). R. at 1226. She is constantly tired (due to both COPD and hepatitis). R. at 1228-29. She alleged she has three or four herniated discs for which she is prescribed Percocet; Dr. Miller suggested she see a specialist, but she has not done so. R. at 1229-30. Her back problems have persisted for six to seven years, and rate an eight on a scale of one to ten. R. at 1230-31. She testified she could sit for fifteen to twenty minutes in a work setting before her hands would cramp and her back would hurt. R. at 1233-34. She cannot walk far before getting tired and needing to rest. R. at 1236.

The ALJ elicited testimony from a vocational expert ("VE"). The VE was asked to assume a person of Plaintiff's age, education, and work history with a limited ability to read, write and use numbers, and was limited to "[v]ery simple reading and writing [and] no math." The person was further limited to work at the light exertional level, with limited exposure to fumes, dust, gases and odors, and that involved short, simple instructions and routine supervision. The VE was also asked to assume the person suffered from mild to moderate pain at all times but could concentrate on the tasks described if allowed to change positions as needed. The VE testified such a person

6

could not return to their past work. R. at 1244-46. However, such a person could perform unskilled light and sedentary work such as a various types of assembly work and mail clerk. R. at 1246-47. When asked to assume a person restricted in the manner described in both the MSS-M and the MSS-P, the VE testified such a person could not perform any type of work. R. at 1248-49. The ALJ ultimately determined Plaintiff was limited in the manner described in his first hypothetical question and, based on the VE's testimony, concluded Plaintiff can perform work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A.

Plaintiff first contends the ALJ failed to accord sufficient weight to the opinion of Plaintiff's treating physician, Dr. Miller. Setting aside the fact that Dr. Miller first saw Plaintiff in July 2005 (and did not provide an opinion about Plaintiff's condition prior to that date), and accepting that Dr. Miller was a treating physician after that date, the ALJ was justified in his decision not to grant controlling weight to the MSS-P.

7

Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Dr. Miller does not appear to have performed or obtained any tests. In fact, his records are remarkably sparse given the serious and chronic nature of Plaintiff's complaints, and he never imposed any restrictions on Plaintiff's activities other than those expressed in the MSS-P. The record supports a conclusion that those limitations are merely Plaintiff's statements to Dr. Miller, and not a medical determination made by Dr. Miller based on his expertise as a doctor. In short, it is doubtful that the MSS-P represents a "medical" opinion – and even if it did, there is no medical basis for it. Finally, the MSS-P's limitations are inconsistent with the MRI's and other diagnostic results produced by other doctors.

<u>B.</u>

Plaintiff next faults the ALJ for failing to properly assess her credibility and, in turn, her residual functional capacity. The critical issue is not whether Plaintiff experiences pain or difficulty breathing, but rather the degree of pain or difficulty that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just

> one factor to be considered in evaluating the credibility of the
> testimony and complaints. The adjudicator must give full
> consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work
> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The Court accepts Plaintiff's argument that her subjective complaints cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. However, the lack of medical evidence is a factor that can be considered. Here, there is no medical evidence to support the degree of debilitating pain she describes. The ALJ also properly considered what he (and various doctors) view as drug-seeking behavior on Plaintiff's part, and was entitled to view her complaints as an effort to justify the narcotic pain medication she sought from multiple sources. The ALJ could also discount Plaintiff's credibility based on her failure to follow her doctors' directive that she stop smoking, particularly given the effect smoking had on her COPD and, in turn, on her endurance and overall health. E.g., Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008).

C.

Plaintiff also argues the ALJ ignored her mental residual functional capacity. At the outset, the Court declines to characterize Dr. Wilson as Plaintiff's treating psychologist; she had seen Plaintiff only three times, which does not seem sufficient to provide the experience that justifies deference. Nonetheless, the Court disagrees with Plaintiff's characterization of the ALJ's handling of the issue. His hypothetical question to the VE fairly summarized the information in the Record. The ALJ's written opinion noted Plaintiff had a limited education. R. at 24. Later, the opinion observed Plaintiff's ability to perform the full range of work "has been impeded by additional limitations" and referenced the VE's testimony as the means for determining whether those limitations precluded Plaintiff from performing work. R. at 25. The written order does not repeat the full list of Plaintiff's limitations, but incorporates by reference those discussed during the hearing and concludes Plaintiff can perform the jobs identified by the VE in response to the hypothetical question incorporating Plaintiff's mental limitations. While not a model of clarity, at worst the opinion suffers from a deficiency of technique – which is not a sufficient basis for reversal. E.g., Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).

### III. CONCLUSION

The Commissioner's final decision denying benefits is affirmed because it is supported by substantial evidence in the Record as a whole.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: January 8, 2009    UNITED STATES DISTRICT COURT